**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM SCHIFFBAUER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:07CV 174 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of William Schiffbauer for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 15). Defendant has filed a Brief in Support of the Answer. (Doc. No. 21).

## Procedural History

On August 23, 2004, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on September 11, 2003. (Tr. 123-25). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated May 18, 2006. (Tr. 100-04, 12-22). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on October 5, 2007. (Tr. 8-9, 3-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on January 23, 2006. (Tr. 25). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by admitting the exhibits into the record. (Tr. 26).

The ALJ then examined plaintiff, who testified that he lived in a rental home with his wife. (Tr. 27). Plaintiff stated that his wife was receiving Social Security disability benefits at the time of the hearing. (Id.). Plaintiff testified that he attended college to pursue an accounting degree for one year. (Id.). Plaintiff stated that he did not receive a certificate or any vocational training. (Id.).

Plaintiff testified that he worked as a custodian for Nebraska Health Systems. (Id.). Plaintiff stated that he lost this job because he could not keep up with the work demands due to his posttraumatic stress disorder (PTSD)[1] and Hepatitis C.[2] (Id.).

Plaintiff testified that he contracted Hepatitis C when he was serving in Vietnam from

---

[1]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria. See Stedman's Medical Dictionary, 570 (28th Ed. 2006).

[2]Inflammation of the liver due to viral infection. About 75 percent of Hepatitis C infections give rise to chronic persistent infection. A high percentage of these develop chronic liver disease leading to cirrhosis and possible hepatocellular carcinoma. See Stedman's at 877.

either dirty water or carrying the wounded on ships. (Tr. 28). Plaintiff stated that the VA will not treat his Hepatitis C due to his depression. (Id.). Plaintiff testified that he suffers from severe depression and his doctors told him that the Hepatitis C medication could cause him to become suicidal. (Id.). Plaintiff stated that, although he left the military with Hepatitis C, it was dormant and did not show up until 1991. (Id.). Plaintiff testified that he was diagnosed with Hepatitis by the VA and the VA determined that it was service-connected. (Id.).

Plaintiff stated that he has not received any vocational technical training or vocational rehabilitation. (Id.). Plaintiff testified that when he was in the military, his job was to bring the wounded onto a helicopter ship and take care of supplies. (Tr. 29). Plaintiff stated that he received vocational training through the VA to be a truck driver but he was unable to work as a truck driver because he is color blind. (Tr. 30).

Plaintiff testified that he received a workers' compensation settlement from injuring his shoulder when he worked at Hanover Regional Hospital. (Id.).

Plaintiff stated that he has received unemployment benefits. (Id.). Plaintiff testified that he last received unemployment benefits in March of 2004, before he started drawing VA pension benefits in April of 2004. (Id.). The ALJ noted that, in applying for unemployment benefits, plaintiff was holding himself out as ready, willing, and able to work. (Tr. 31). Plaintiff agreed with the ALJ's assessment. (Id.). The ALJ stated that plaintiff's application for unemployment benefits was thus inconsistent with his allegations of disability. (Tr. 31).

Plaintiff testified that he was incarcerated at Douglas County Correctional Center in 1979. (Id.). Plaintiff stated that he had been convicted of three DUI or DWIs. (Id.). Plaintiff testified that his last DUI or DWI conviction was in 1990. (Id.).

Plaintiff stated that he had been through many rehabilitation programs for alcohol or drugs and that he was last treated in 1993. (Tr. 32). Plaintiff testified that he had been sober since 1993. (Id.). Plaintiff stated that he had not done drugs since 1975. (Id.).

Plaintiff testified that he did not perform volunteer work at the time of the hearing, but he was considering volunteering at the VA hospital two days a week. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he was fired from his job at Nebraska Health Systems because he could not keep up, he became confused due to the medications he takes, and he had a temper from PTSD and Hepatitis C. (Tr. 33). Plaintiff stated that he experiences fatigue and severe pain in his lower stomach and his side due to the Hepatitis C. (Id.). Plaintiff testified that he takes Tylenol with Codeine[3] for his stomach pain. (Id.).

Plaintiff stated that he suffers from arthritis in his lower back, knees, and feet. (Tr. 34). Plaintiff testified that he was diagnosed with arthritis by the VA. (Id.). Plaintiff stated that he also takes Tylenol for his arthritis pain. (Id.). Plaintiff testified that his arthritis pain prevents him from sitting or standing for long periods. (Id.). Plaintiff stated that after five minutes of standing or sitting, he experiences pain. (Tr. 35). Plaintiff testified that he is able to walk about four city blocks. (Id.). Plaintiff stated that he is able to lift ten to twenty pounds. (Id.).

Plaintiff testified that he was not taking any pain medications other than the Tylenol with Codeine. (Tr. 36). Plaintiff stated that he occasionally takes over-the-counter Aleve for the arthritis pain. (Id.). Plaintiff testified that he does not do anything else to relieve his pain. (Id.).

Plaintiff stated that he suffers from hearing loss. (Id.). Plaintiff testified that he has ten

---

[3]Tylenol with Codeine is indicated for the relief of mild to moderately severe pain. See Physician's Desk Reference (PDR), 2548 (59th Ed. 2005).

percent tinnitus.[4]  (Id.).  Plaintiff stated that he does not have hearing aids, although he may need hearing aids in six months to a year.  (Id.).

Plaintiff testified that he has a skin condition due to agent orange exposure in Vietnam. (Tr. 37).  Plaintiff stated that he experiences breakouts when exposed to sun or humidity.  (Id.). Plaintiff testified that he uses a prescription cream weekly, which is not effective.  (Id.).

The ALJ noted that plaintiff was reviewing a list of medications that he had compiled. (Tr. 37).  The ALJ reviewed plaintiff's list and determined that it was different from the list contained in the file.  (Tr. 38).  Plaintiff submitted his list to be included in the file.  (Id.).

Plaintiff's attorney resumed examining plaintiff, who testified that he experiences chest pain due to acid reflux.  (Tr. 40).  Plaintiff stated that he takes Omerprazole[5] for his acid reflux. (Id.).

Plaintiff testified that he suffers from PTSD, which has been determined to be service-related.  (Tr. 41).  Plaintiff stated that the VA has found that his PTSD is permanently disabling. (Id.).  Plaintiff testified that he experiences flashbacks and nightmares due to his PTSD.  (Id.). Plaintiff stated that he also experiences severe depression as a result of the PTSD.  (Tr. 42).

Plaintiff testified that his depression affects his daily life by making it difficult to get along with his wife.  (Id.).  Plaintiff stated that he becomes angry and throws things.  (Id.).  Plaintiff testified that he is unable to go to the grocery store with his wife or participate in any social activities.  (Id.).  Plaintiff stated that he does not attend church because he was unable to find a

---

[4]Perception of a sound in the absence of an environmental acoustic stimulus.  See Stedman's at 1992.

[5]Omerprazole is indicated for the treatment of GERD.  See PDR at 3016.

Lutheran church in the area and because he has no desire to attend church. (Tr. 43).

The ALJ then re-examined plaintiff, who testified that, on a typical day, he wakes up between 7:00 and 8:00 a.m., drinks coffee, and reads the newspaper. (Tr. 44). Plaintiff stated that he enjoys reading the newspaper. (Id.). Plaintiff testified that he then likes to watch television or a movie. (Tr. 45). Plaintiff stated that he is able to watch a movie from beginning to end. (Id.). Plaintiff testified that he attends a PTSD class at the VA in Poplar Bluff every Wednesday. (Id.). Plaintiff stated that he drives. (Id.). Plaintiff testified that he recently had his driving privileges reinstated after losing them for fifteen years due to DUI or DWIs. (Id.). Plaintiff stated that his wife does the shopping and household cleaning. (Id.). Plaintiff testified that his wife manages the household's finances. (Tr. 46). Plaintiff stated that he is no longer able to perform yard work. (Id.). Plaintiff testified that his stepson does the yard work. (Id.).

Plaintiff stated that he was not living at his home at the time of the hearing because his home was damaged in a sewage flood. (Id.). Plaintiff testified that he did not clean up the sewage because he believed it was the city's obligation to clean the sewage. (Id.). Plaintiff stated that he plans to file suit against the city. (Id.). Plaintiff testified that he experiences stress due to this situation. (Id.).

Plaintiff stated that he has one dog and one cat. (Tr. 47). Plaintiff testified that both of his pets were in the animal hospital at the time of the hearing. (Id.).

Plaintiff stated that his wife uses a computer for personal finance and Internet surfing. Plaintiff testified that he does not know how to use the computer. (Id.).

**B.      Relevant Medical Records**

The record reveals that plaintiff presented to the Omaha Veteran's Administration Medical

Center ("Omaha VA") on October 4, 2002, with a letter from his lawyer with regards to Hepatitis

C.  (Tr. 453).  It was noted that plaintiff had not been seen since January 12, 2001.  (Id.).  Plaintiff

complained of nausea, vomiting, and fatigue for two weeks that he attributed to Hepatitis C.  (Tr.

453).  The assessment of William F. Gust, M.D. was Hepatitis C; history of PTSD; and symptoms

of nausea, vomiting, and fatigue.  (Id.).  Dr. Gust stated that plaintiff's symptoms of nausea,

vomiting, and fatigue were not likely related to Hepatitis C but were likely viral.  (Tr. 454).

Plaintiff presented to Ernest A. Haffke, M.D. at the Omaha VA for an evaluation for

PTSD.  (Tr. 451-52).  Plaintiff was diagnosed with PTSD and assessed a GAF[6] of 60.[7]  (Tr. 452).

Plaintiff underwent an audiological evaluation at the Omaha VA on November 25, 2002,

which revealed a mild to moderately severe high frequency hearing loss and subjective tinnitus.

(Tr. 444).

On December 2, 2002, plaintiff presented to the Omaha VA with complaints of a rash on

---

[6]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool
wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness" which does "not include impairment in
functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of
Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[7]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school
functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

his arms and thighs.  (Tr. 442).  Plaintiff was diagnosed with tinea versicolor[8]/papular dermatitis,[9] which was thought to be caused by exposure to Agent Orange.  (Id.).

Plaintiff missed or cancelled four scheduled appointments at the Omaha VA from December 2002 through February 2003.  (Tr. 437-41).

Plaintiff presented to Terry North, Ph.D. at the Omaha VA for a psychological consultation on March 11, 2003.  (Tr. 427-34).  Dr. North administered testing, which produced a profile of "questionable validity."  (Tr. 431).  Plaintiff tended to endorse items that presented an unfavorable impression.  (Id.).  Dr. North indicated that the results should be reviewed with caution because the results were likely to over-represent the extent and degree of significant test findings in certain areas.  (Id.).  Dr. North diagnosed plaintiff with PTSD; major depression;[10] alcohol dependence in sustained, full remission; polysubstance dependence in sustained, full remission; and pathologic gambling history, not active now.  (Tr. 433).  Dr. North noted that objective testing, however, raised questions about the veracity of his symptom reports and his actual level of distress.  (Id.).

Plaintiff presented to Dr. Gust at the Omaha VA on April 4, 2003, with complaints of anxiety and depression due to multiple stressors.  (Tr. 424).  Plaintiff reported that he was having financial and marital difficulties, and that he was starting a new job.  (Id.).  Dr. Gust's assessment

---

[8]An eruption of tan or brown branny patches on the skin of the trunk, often appearing white, in contrast with hyperpigmented skin after exposure to the summer sun; caused by growth of a fungus.  See Stedman's at 1991-1992.

[9]Intensely itchy papular eruption of torso and extremities.  See Stedman's at 518.

[10]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  See Stedman's at 515.

was depression, Hepatitis C, allergic rhinitis, and headaches. (Tr. 424-24). Dr. Gust started plaintiff on Prozac.[11] (Id.).

Plaintiff presented to the Omaha VA on April 7, 2003, for evaluation of his Hepatitis C. (Tr. 422). The examining physician noted that he had reservations about starting drug therapy due to plaintiff's history of suicidal ideation. (Tr. 423). An abdominal ultrasound was recommended. (Id.).

Plaintiff saw Dr. North on April 28, 2003, at which time he was diagnosed with PTSD, depressive disorder, and assessed a GAF of 54. (Tr. 420).

Plaintiff presented to the Omaha VA on May 19, 2003, with complaints of depression. (Tr. 417). Praveen P. Fernandes, M.D. diagnosed plaintiff with PTSD, depression NOS, alcohol dependence in remission, and assessed a GAF of 60. (Tr. 419).

Plaintiff saw Dr. North on June 9, 2003, at which time he was diagnosed with PTSD, alcohol dependence in remission, and assessed a GAF of 55-60. (Tr. 410). Dr. North recommended group psychotherapy. (Id.). Plaintiff attended the Trauma Coping Skills group session that night. (Tr. 409). After the session, plaintiff met with Christopher J. Heaney, Psy. D., who diagnosed plaintiff with PTSD, alcohol dependence, and assessed a GAF of 55. (Id.).

Plaintiff presented to Dr. Fernandes on June 23, 2003, at which time he reported significant improvement in mood since his last visit. (Tr. 408). Dr. Fernandes diagnosed plaintiff with PTSD, depression NOS, alcohol dependence in remission, and assessed a GAF of 60. (Id.).

Plaintiff underwent an abdominal echogram on June 23, 2003, which revealed a right renal

---

[11]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See PDR at 1873-74.

cyst.  (Tr. 457).

Plaintiff presented to Dr. Fernandes on July 7, 2003, at which time he reported worsening of his depression due to his gambling problem, which had resulted in significant financial problems.  (Tr. 406).  Dr. Fernandes diagnosed plaintiff with PTSD, depression NOS, alcohol dependence in remission, and assessed a GAF of 55.  (Id.).

Plaintiff presented to Jeffrey L. Beste, Physician Assistant, at the Omaha VA on July 31, 2003, for a general medical examination.  (Tr. 404).  Mr. Beste expressed the opinion that plaintiff's Hepatitis C did not prevent him from performing "any sedentary work or even physical work.  He might not well be a candidate for any heavy physical work, but certainly any sort of a light duty work, I believe him to be capable of performing."  (Id.).

Plaintiff presented to the Omaha VA for an audio examination on July 31, 2003.  (Tr. 400).  Plaintiff was diagnosed with hearing sensitivity within normal limits for the right ear and a mild to moderately severe high frequency hearing loss for the left ear.  (Id.).  It was found that plaintiff should not work in noisy environments without hearing protection.  (Id.).  It was further found that, given plaintiff's excellent word discrimination scores, hearing loss should have little effect on employment, particularly in his present custodial position.  (Id.).

Plaintiff presented to Dr. Haffke on August 1, 2003, at which time he reported an increase in his PTSD.  (Tr. 396).  Plaintiff indicated that he was having serious marital problems and was planning a separation.  (Tr. 397).  Dr. Haffke diagnosed plaintiff with PTSD; major depression; alcohol dependence in full-sustained remission; polysubstance dependence in full-sustained

remission; and assessed a GAF of 48.[12]  (Tr. 398).

On August 4, 2003, plaintiff presented to Dr. Fernandes, at which time he reported that his symptoms of depression and PTSD were contained since his last visit.  (Tr. 395).  Plaintiff indicated that his stressful situation at home and work with a strict supervisor contributed to the worsening of his depression and PTSD.  (Id.).  Plaintiff reported that he would like to retire and that he was contemplating separation from his wife.  (Id.).  Dr. Fernandes diagnosed plaintiff with PTSD, depression NOS, alcohol dependence in remission, and assessed a GAF of 60.  (Id.).  Dr. Fernandes increased plaintiff's dosage of Paroxetine.[13]  (Id.).

Plaintiff saw Dr. Heaney on August 11, 2003, at which time he reported that his symptoms of PTSD and his marital relationship remained problems.  (Tr. 394).  Dr. Heaney diagnosed plaintiff with PTSD, alcohol dependence in remission, marital discord, and assessed a GAF of 55.  (Id.).

Plaintiff presented to Dr. Fernandes on September 22, 2003, at which time he reported that he was stressed out because he had lost his job at the VA due to missing work.  (Tr. 392).  Plaintiff indicated that he was pursuing an increase in his service connection compensation.  (Id.).  Dr. Fernandes diagnosed plaintiff with PTSD, depression NOS, alcohol dependence in remission, and assessed a GAF of 55.  (Id.).

Plaintiff presented to the Omaha VA on October 16, 2003, with complaints of headaches.

---

[12]A GAF score of 41-50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

[13]Paroxetine is a psychotropic drug indicated for the treatment of depression and anxiety. See PDR at 1592-1593.

(Tr. 390).  Scott F. Menolascino, M.D. noted that plaintiff's Hepatitis C had been well-controlled and that plaintiff had normal kidney function.  (Id.).  Dr. Menolascino diagnosed plaintiff with tension headaches.  (Id.).

Plaintiff presented to Dr. Fernandes on October 27, 2003, at which time he reported excessive sedation due to Olanzapine.  (Tr. 389).  Dr. Fernandes assessed a GAF of 60.  (Id.).  He decreased plaintiff's Olanzapine[14] and continued his Paroxetine.  (Id.).

Plaintiff presented to Dr. Gust on February 20, 2004, at which time he requested treatment for his Hepatitis C.  (Tr. 384).  Dr. Gust noted that plaintiff had undergone ultrasounds, which revealed a normal liver and gallbladder.  (Id.).  Dr. Gust also noted that plaintiff had missed several GI appointments.  (Id.).  Dr. Gust referred plaintiff to GI and instructed plaintiff to call and reschedule if he could not make the appointment.  (Tr. 385).

Plaintiff presented to Dr. Fernandes on March 5, 2004, at which time he reported continuing sadness and irritability, prominent marital discord, and disturbed sleep.  (Tr. 382).  Dr. Fernandes assessed a GAF of 60.  (Id.).  He increased plaintiff's Paroxetine and recommended that plaintiff continue attending group sessions.  (Id.).

Plaintiff presented to Dr. Heaney on March 26, 2004, at which time he reported being depressed and recounted violence between him and his wife.  (Tr. 330).  Dr. Heaney's assessment was significant marital discord, depression, PTSD by history, and a GAF of 45.  (Tr. 380-81).  Plaintiff returned for a follow-up on March 29, 2004, at which time he reported some increase in control of his agitation.  (Tr. 378).  Dr. Heaney assessed a GAF of 50 and encouraged plaintiff to

---

[14]Olanzapine is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder.  See PDR at 1899-1900.

attend more AA meetings.  (Id.).  On April 2, 2004, plaintiff reported that he had consistently remained calm in his interactions with his wife.  (Tr. 376).  Plaintiff also indicated that he was walking for exercise.  (Id.).  Dr. Heaney found that plaintiff's marital discord was dissipating to a notable degree and that plaintiff had attained his goals and exhibited relatively good insight.  (Id.).  He assessed a GAF of 55.  (Id.).

Plaintiff presented to Dr. Fernandes on April 7, 2004, at which time he reported significant improvement in mood since his last visit, with fewer arguments with his wife.  (Tr. 375).  Dr. Fernandes assessed a GAF of 70[15] and stated that plaintiff was benefitting from his medication regimen.  (Id.).

Plaintiff presented to Dr. Heaney on April 20, 2004, at which time he reported an increase in depression.  (Tr. 373).  Dr. Heaney noted that plaintiff had stopped taking his medication four days prior, had been absorbed in media coverage of the Iraq war, had not been to an AA meeting or called his sponsor for about one week, and had not continued to exercise.  (Id.).  Plaintiff reported that he was pursuing unemployment benefits.  (Id.).  Dr. Heaney assessed a GAF of 50.  (Id.).  He recommended that plaintiff re-start his medications, attend AA meetings, contact his sponsor, exercise, and start couples counseling.  (Id.).  On May 26, 2004, plaintiff reported increased depression due to the stress of taking care of his wife after she underwent surgery.  (Tr. 371).  Dr. Heaney's assessment was PTSD; alcohol dependence still in remission; depression; and stress of increased care giver duties.  (Id.).  He assessed a GAF of 50.  (Id.).

---

[15]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

Plaintiff presented to the emergency room at the Omaha VA on June 4, 2004, with complaints of abdominal pain. (Tr. 370). It was noted that plaintiff had recently undergone a colonoscopy, which revealed diverticulosis.[16] (Id.). The assessment of the examining physician was recurrent abdominal pain, exact etiology unknown. (Id.).

Plaintiff presented to the Omaha VA for a Compensation and Pension exam of his liver, gallbladder, and pancreas on June 11, 2004. (Tr. 363-66). Plaintiff was diagnosed with chronic Hepatitis C, with no evidence of hepatomegaly[17] and reports of marked gastrointestinal symptoms including diarrhea, nausea, vomiting, and abdominal pain; history of diverticulosis; and history of alcohol abuse. (Tr. 366). In an addendum dated August 11, 2004, it was noted that, based upon all the history that had been reviewed and lab testing, it was more likely than not plaintiff's symptoms were related to his chronic Hepatitis C infection and that plaintiff had mild demonstrable liver damage. (Id.).

Plaintiff presented to Dr. Fernandes on June 23, 2004, at which time he reported that he had been doing okay since his last visit. (Tr. 362). Dr. Fernandes assessed a GAF of 70. (Id.). Plaintiff also saw Dr. Heaney on this date. (Tr. 361). Plaintiff indicated that he was contemplating moving to Southeast Missouri. (Id.). Dr. Heaney assessed a GAF of 60. (Id.).

Plaintiff presented to Dr. Heaney for a follow-up on July 26, 2004, at which time he reported that his marital communication had improved, he planned to move to Missouri, and he was having trouble with his PTSD due to coverage of the war in Iraq. (Tr. 356). Dr. Heaney

---

[16]Presence of a number of diverticula of the intestine, common in middle age. Diverticula are pouches or sacs opening from a tubular or saccular organ, such as the gut or bladder. See Stedman's at 575.

[17]Enlargement of the liver. See Stedman's at 878.

assessed a GAF of 58.  (Id.).

Plaintiff presented to the GI clinic at the Omaha VA on July 26, 2004, for a follow-up regarding his Hepatitis C.  (Tr. 353).  The assessment was Hepatitis C with enzymes fairly stable since diagnosis in 1997, and ultrasound showing a normal liver.  (Id.).  It was noted that plaintiff could benefit from drug therapy as long as his depression continued to remain stable, although he was moving to Missouri in one week.  (Id.).

Plaintiff presented to Chul Kim, M.D. for a consultative internist examination at the request of the state agency on September 15, 2004.  (Tr. 332-37).  Plaintiff complained of PTSD, hearing loss, Hepatitis C, skin problems, and arthritis.  (Tr. 332).  Upon physical examination, plaintiff had no limitation of range of motion in any major joint, although he complained of pain with range of motion activity in his knees.  (Tr. 335).  He was able to bear full weight on both legs, squat, and to get on and off the examining table without significant problem, but walking on his heels and toes gave him pain in the lower back and feet.  (Id.).  Dr. Chul's impression was PTSD, bilateral hearing loss, Hepatitis C, frequent episodes of skin infection, multiple joint pain with osteoarthritis,[18] and probable lipoma on the mid back.  (Id.).

Plaintiff underwent x-rays of the lumbar spine on September 29, 2004, which were normal.  (Tr. 331).

Plaintiff presented to the John J. Pershing Veteran's Medical Center in Poplar Bluff, Missouri ("VA") on September 14, 2004, to transfer his care from Omaha.  (Tr. 270).

---

[18]Osteoarthritis is characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints.  See Stedman's at 1388.

Plaintiff presented to John Chatel, M.D. at the VA on October 13, 2004, at which time plaintiff reported that he continued to be bothered by his experience in Vietnam in the form of sleep disorder, nightmares, and flashbacks, which were exacerbated by news programs about the war in Iraq. (Tr. 269). Dr. Chatel diagnosed plaintiff with PTSD, chronic, with Vietnam stressors; major depressive disorder, recurrent, severe, with mood congruent psychotic features, in partial remission; alcohol dependence in full sustained remission; pain disorder associated with psychological factors and a general medical condition; and a GAF of 50. (Tr. 269-70).

James M. Spence, Ph.D. completed a Psychiatric Review Technique on October 19, 2004. (Tr. 153-66). Dr. Spence found that plaintiff suffered from PTSD and alcohol dependence in remission. (Id.). Dr. Spence expressed the opinion that plaintiff had mild restriction of his activities of daily living; and moderate limitations in his ability to maintain social function, and his ability to maintain concentration, persistence, and pace. (Id.).

Dr. Spence also completed a Mental Residual Functional Capacity Assessment. (Tr. 167-68). Dr. Spence expressed the opinion that plaintiff had moderate limitations in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Id.). Dr. Spence concluded that plaintiff retains the capacity to complete simple, repetitive tasks on a sustained basis. (Tr. 169). Dr. Spence stated that plaintiff "will function most efficiently in a

low-demand work environment which requires only minimal contact with others."  (Id.).

Plaintiff presented to the VA gastroenterology clinic on November 3, 2004, for a consultation regarding his Hepatitis C.  (Tr. 265).  The impression of Madad Ali, M.D. was type 2b Hepatitis C, which is usually not as aggressive and more benign in nature.  (Tr. 266).  Dr. Ali indicated that plaintiff did not want to start treatment due to fears about the side effects.  (Id.).

Plaintiff presented to Joseph K. Sunny, M.D. at the VA on November 22, 2004, for medication management and psychotherapy.  (Tr. 259).  Plaintiff reported that he was happy with his improvement, although he wanted to resume therapy.  (Id.).  Plaintiff appeared anxious, had a tendency to ask the examiner a lot of personal questions, and had slight difficulty keeping his boundaries.  (Id.).  Plaintiff reported occasional flashbacks about Vietnam but no hallucinations or suicidal or homicidal thoughts.  (Tr. 260).  Dr. Sunny diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features, in remission; PTSD; alcohol dependence in remission since 1993; and a GAF of 55.  (Id.).  Dr. Sunny stated that plaintiff had been fairly stable on medication.  (Id.).  He referred plaintiff to PTSD therapy due to a slight setback in systems after moving to a new place.  (Id.).

Donald E. Edwards, M.D. completed a Physical Residual Functional Capacity Assessment on December 10, 2004.  (Tr. 145-52).  Dr. Edwards expressed the opinion that plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull an unlimited amount.  (Tr. 145).  Dr. Edwards found that plaintiff should only occasionally climb ladders, ropes, or scaffolds due to the fatigue factor of Hepatitis C.  (Tr. 147).  Dr. Edwards found no manipulative, visual, or communicative limitations.  (Tr. 148-49).  Dr.

Edwards found that plaintiff should avoid even moderate exposure to noisy environments unless protection is provided. (Tr. 149). As support for his findings, Dr. Edwards noted that there was no medical evidence of severe chronic liver disease, plaintiff's hearing loss did not affect normal conversational function, and there were no tests or clinical evidence to support plaintiff's allegation of arthritis. (Tr. 150).

Plaintiff was seen by John O. Wood, Psy.D. at the VA for a Compensation and Pension examination on January 13, 2005. (Tr. 278-82). Dr. Wood diagnosed plaintiff with dysthymic disorder;[19] PTSD; alcohol dependence in sustained remission since 1997; polysubstance dependence by history; personality disorder, not otherwise specified; and a GAF of 50 to 55. (Tr. 282). Dr. Wood recommended continued psychiatric treatment and therapy, including group therapy for PTSD. (Id.). Dr. Wood found that plaintiff was capable of managing his own financial resources. (Id.).

Plaintiff presented to Dr. Sunny on February 14, 2005, with complaints of not sleeping well, anxiety about financial issues, and difficulty in adjusting to his new place. (Tr. 255). Plaintiff indicated that he was losing his temper with his wife. (Id.). Dr. Sunny diagnosed plaintiff with major depressive disorder, recurrent; PTSD; and alcohol dependence in remission. (Tr. 256). He increased plaintiff's dosage of Olanzapine. (Id.).

Plaintiff presented to clinical psychologist Marylee Jennings at the VA on February 14, 2005. (Tr. 256). Dr. Jennings administered psychological testing, which revealed plaintiff suffered from PTSD and mild depression. (Tr. 257). Dr. Jennings diagnosed plaintiff with

---

[19]A chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. See Stedman's at 569.

chronic PTSD. (Tr. 258). Plaintiff expressed a desire to be in a PTSD group and depression group. (Id.).

Plaintiff presented to Dr. Sunny on April 13, 2005, at which time he reported that he continued to feel sad and worried, had difficulty sleeping, and experienced nightmares. (Tr. 253). Dr. Sunny diagnosed plaintiff with major depressive disorder, recurrent, moderate; PTSD; and alcohol dependence in remission. (Tr. 254). He prescribed Mirtazapine,[20] Paroxetine, and Olanzapine. (Id.).

Plaintiff presented to Dr. Sunny on June 8, 2005, at which time he reported that he had been sleeping better and worried less. (Tr. 252). Plaintiff appeared calm. (Id.). Dr. Sunny diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features in remission; PTSD; alcohol dependence in remission since 1993; and a GAF of 60 to 65. (Id.). Dr. Sunny increased plaintiff's Mirtazapine, and reduced his Paroxetine and Olanzapine. (Id.).

Plaintiff attended PTSD group sessions in July 2005. (Tr. 242).

Plaintiff underwent a CT scan of the abdomen and pelvis on July 25, 2005, which revealed diverticulosis, osteoarthritis involving the spine, arteriosclerotic plaque in the abdominal aorta and iliac arteries and bladder diverticulum. (Tr. 243).

Plaintiff attended PTSD group sessions in September 2005. (Tr. 233-36).

Plaintiff presented to the VA dermatitis clinic on September 14, 2005, with complaints of a rash on his neck, chest, abdomen, and back for thirty-five years. (Tr. 236). Plaintiff was diagnosed with tinea versicolor. (Id.).

---

[20]Mirtazapine is an antidepressant indicated for the treatment of major depression. See PDR at 2213.

Plaintiff presented to the VA for a counseling session on September 30, 2005, due to a flare-up of anger with his wife the previous week. (Tr. 232). Plaintiff reported that he enjoyed watching sports, walked one mile a day for exercise, and that he may try volunteering a couple of days a week. (Id.). Plaintiff complained of intrusive thoughts when he watched the news or when he was not occupied. (Id.). The therapist discussed with plaintiff ways to manage his anger. (Id.).

Plaintiff presented to Dr. Sunny on October 4, 2005, at which time he reported that he was doing well except for his constant bickering with his wife due to her failure to pay the bills on time. (Tr. 231). Although plaintiff reported that he had been taking his medications regularly, Dr. Sunny noted that plaintiff had not refilled his medications, including his Paroxetine, Mirtazapine, and Olanzapine, since June 8, 2005. (Id.). Plaintiff requested nerve medication to control his anger towards his wife. (Id.). Dr. Sunny instead recommended that plaintiff pay the household bills, and plaintiff indicated that he would. (Id.). Dr. Sunny diagnosed plaintiff with major depressive disorder recurrent, severe with psychotic features in remission; PTSD; alcohol dependence in remission; and a GAF of 60. (Id.). Dr. Sunny emphasized the importance of taking his medications regularly. (Id.).

Plaintiff presented to the VA primary care clinic on October 25, 2005, for a follow up regarding his Hepatitis C. (Tr. 225). Plaintiff requested Tylenol 3 for his aches and pains. (Tr. 226). It was noted that Tylenol 3 had been discontinued because of exacerbation of diverticulosis, which had since resolved. (Id.).

Plaintiff attended PTSD group sessions in October and November of 2005. (Tr. 225, 519).

Plaintiff presented to Dr. Sunny on December 27, 2005, at which time plaintiff reported that he had been taking his medications regularly. (Tr. 517). Dr. Sunny, however, noted that plaintiff had not had a refill of any of his medications since June 8, 2005. (Id.). Plaintiff reported that he was not suffering from any depression, although he emphasized that he suffered from severe and persistent recurrent flashbacks and nightmares about Vietnam incidents. (Tr. 518). At the end of the interview, plaintiff's wife informed Dr. Sunny that plaintiff was not able to stay awake or focus when he took his medications and that she did not know whether plaintiff was taking his medications regularly. (Id.). Dr. Sunny informed plaintiff that he would cut his dosages of medication due to plaintiff's noncompliance. (Id.). Dr. Sunny noted that plaintiff then stated to his wife, "[d]on't let him cut down the medications in my records, I will talk to you about it in the hallway." (Id.). Dr. Sunny diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features in remission; past history of PTSD and alcohol dependence; and a GAF of 70 to 75.[21] (Id.). Dr. Sunny reduced plaintiff's dosages of medication and emphasized the importance of taking his medications regularly. (Id.).

Plaintiff presented to the VA for a scheduled counseling session on January 4, 2006, at which time he reported that his sleep had been poor, with some nightmares and flashbacks. (Tr. 516). Plaintiff also reported some increase in irritability but no loss of control of his anger. (Id.). Plaintiff indicated that he and his wife had been living in an apartment because their home was flooded with sewer water. (Id.).

---

[21]A GAF score of 71 to 80 denotes "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV at 32.

Plaintiff presented to the dermatology clinic on January 4, 2006, for a follow-up regarding his tinea versicolor. (Tr. 515). The impression of the examining physician was tinea versicolor, clinically improved since last visit; and itching, which may be associated with Hepatitis C. (Tr. 516).

Plaintiff attended group PTSD meetings in January and February of 2006. (Tr. 509, 505).

Plaintiff presented for a scheduled counseling session at the VA on February 14, 2006, at which time he reported that he still had some nightmares and periods of depression. (Tr. 504). Plaintiff indicated that he had been walking about one mile a day for exercise and stress management and that he had recently obtained his driver's license after being without it for many yeas due to DWIs. (Id.).

Plaintiff attended group PTSD meetings in April 2006. (Tr. 503, 495).

Plaintiff presented for a scheduled counseling session at the VA on April 6, 2006, at which time he reported that he did not sleep well the previous night due to an argument he had with his wife. (Tr. 503). Plaintiff reported stress due to financial problems, much of which was caused by his home being flooded. (Id.). Plaintiff also reported problems with his anger, although he denied any physical aggression. (Id.). Plaintiff indicated that he was still walking with his dog on a daily basis, which calmed him down. (Id.).

Plaintiff presented to the primary care clinic on April 13, 2006, at which time he indicated that he would like to switch his pain medications as Tylenol 3 was not working. (Tr. 495). Plaintiff's wife reported that plaintiff occasionally had problems with anxiety and anger issues.

(Id.).  Tylenol 3 was discontinued and plaintiff was given a trial of Ultram.[22]  (Tr. 496).  Plaintiff requested a dermatology consultation due to a skin lesion and a urology consultation due to an abnormal pelvic ultrasound and intermittent hypogastric pain.  (Id.).

Plaintiff presented to the VA for a scheduled psychiatry appointment with Kathleen M. Lasar, ARNP, on June 1, 2006.  (Tr. 491).  Ms. Lasar found that plaintiff appeared fairly stable emotionally.  (Id.).  Plaintiff complained of occasional flashbacks and depression and grogginess in the morning.  (Id.).  Plaintiff indicated that he took Ultram and Tylenol 3 at bedtime in addition to Paroxetine and Olanzapine.  (Id.).  Ms. Lasar noted that plaintiff was probably over-sedated. (Id.).  Plaintiff indicated that he did not want to start treatment for his Hepatitis C due to a fear of side effects.  (Id.).  Ms. Lasar stated that plaintiff's main issue seemed to be the fact that the rental house that he was living in had a sewer backup several months prior.  (Id.).  Ms. Lasar diagnosed plaintiff with PTSD and assessed a GAF of 60.  (Id.).  She continued plaintiff's medications and instructed plaintiff not to use pain medications at bedtime.  (Id.).

Plaintiff presented to the dermatology clinic on June 20, 2006, for a follow-up regarding his tinea versicolor.  (Tr. 488).  Dorothy Jean Cline, M.D. noted that a rash was scattered on plaintiff's arms and chest.  (Id.).  Dr. Cline recommended that plaintiff continue to use a prescription shampoo weekly and start using a prescription cream once daily.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act
      through December 31, 2008.

_____

[22]Ultram is indicated for the management of moderate to moderately severe pain.  See PDR at 2553.

2.   The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: hepatitis C, major depressive disorder, post-traumatic stress disorder, diverticulosis and sensorineural hearing loss (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to sit, stand or walk throughout a work day, to lift and carry up to 50 pounds occasionally and 25 pounds frequently, and that he must avoid complex work and work involving a great deal of interaction with others, and that if exposed to excessive noise he must be provided with hearing protection.

6.   The claimant can perform his past relevant work as a janitor (20 CFR 404.1565).

7.   The claimant was born on December 10, 1948 and was 54 years old on the alleged disability onset date, which is defined as closely approaching advanced age, and shortly thereafter reached age 55 which is defined as advanced age (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

(Tr. 14, 15, 20, 21).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on August 23, 2004, the claimant is not disabled under Sections 216(I) and 223(d) of the Social Security Act.

(Tr. 22).

<u>**Discussion**</u>

**A.      <u>Standard of Review</u>**

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  <u>See</u> <u>Ostronski v. Chater</u>, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  <u>See</u> <u>Roberts v. Apfel</u>,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  <u>See</u> <u>Kelley v.</u>

<u>Callahan</u>, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  <u>See</u> <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  <u>See</u> <u>Johnson v. Chater</u>, 87 F.3d 1015,

1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contrary."  <u>Burress v. Apfel</u>, 141

F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

<u>Id.</u>

**B.      <u>The Determination of Disability</u>**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See</u> <u>id</u>. Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See</u> <u>id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); <u>Pratt</u>, 956 F.2d at 834-35; <u>Jones v. Callahan</u>, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.     <u>Plaintiff's Claims</u>**

Plaintiff raises three claims on appeal from the decision of the Commissioner. Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff next contends that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation. Plaintiff finally argues that the ALJ erred in failing to obtain vocational expert testimony. The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility assessment.

1.    **Credibility Assessment**

Plaintiff argues that the ALJ erroneously found his subjective complaints of pain and limitation not credible.  Defendant contends that the ALJ properly applied the Polaski factors and found that plaintiff's subjective complaints were not credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work."  Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is

whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In her opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 15-16). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first discussed her own observations of plaintiff during the hearing. (Tr. 16). The ALJ stated that plaintiff sat comfortably throughout the proceedings without any signs of pain, discomfort, anxiety or depression. (Tr. 16). The ALJ noted that plaintiff maintained his concentration and attention, had no difficulty answering questions, and was able to cooperate with his attorney and advocate for himself. (Id.). The ALJ acknowledged that, while her observations, standing alone, were not controlling, they were entitled to some consideration in conjunction with the remainder of the evidence. (Id.). An ALJ is permitted to take notice of a claimant's demeanor during an administrative hearing, however the ALJ is not free to reject a claimant's credibility on account of the claimant's failure to sit and squirm during th hearing. Cline v. Sullivan, 939 F.2d 560, 567-68 (8th Cir. 1991). In this case, the ALJ properly noted plaintiff's demeanor at the hearing.

The ALJ next discussed the medical evidence and found that it did not support plaintiff's subjective complaints. (Tr. 14-16). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ first discussed plaintiff's physical impairments. (Tr. 16). The ALJ stated that, although plaintiff has been diagnosed with Hepatitis C, examinations have shown no hepatomegaly, his liver enzymes were normal for a year, on ultrasound his liver was completely normal, and VA physicians have

observed that plaintiff's type of Hepatitis C was more benign in nature and resulted in only mild

liver damage. (Tr. 16, 423, 404, 403, 402, 266, 366). The ALJ noted that plaintiff missed or

canceled many appointments with the GI specialist. (Tr. 17, 384). The ALJ further noted that

plaintiff has declined medication treatment for his Hepatitis C. (Tr. 18). The ALJ stated that, if

plaintiff found the Hepatitis C troublesome, it would seem that he would be motivated to start

treatment. (Id.). The ALJ concluded that the medical evidence reveals that plaintiff's Hepatitis C

is a benign, mild impairment. (Tr. 16).

The ALJ also discussed plaintiff's rash, diverticulosis, and hearing impairment. The ALJ

stated that plaintiff's rash is benign and does not interfere with his ability to work. (Tr. 17). The

ALJ noted that plaintiff has documented diverticulosis, but it has been asymptomatic and when it

did flare up, it responded to treatment. (Tr. 17, 225). The ALJ stated that, although plaintiff

suffers from hearing loss, VA physicians found that he has excellent word recognition and that his

hearing loss should have little effect on his employment, other than he should not work in noisy

environments without ear protection. (Tr. 17, 400). The ALJ properly found that these physical

impairments have little effect on plaintiff's ability to work. (Tr. 17).

The ALJ next discussed the medical evidence regarding plaintiff's mental impairments.

(Tr. 16). The ALJ noted that plaintiff has not required psychiatric hospitalizations for his PTSD

or depression. (Tr. 16). The ALJ stated that plaintiff's GAF scores tend to be around 60 and

have been as high as 75. (Tr. 16-17). The ALJ acknowledged that plaintiff has had lower GAF

scores, but noted that they have not persisted. (Tr. 17). The ALJ stated that plaintiff's mental

impairments tend to respond to treatment. (Id.). The ALJ also pointed out that plaintiff produced

questionable and invalid results on two psychological tests with validity indicators. (Tr. 18, 49,

47). Specifically, Dr. North noted that plaintiff "tended to endorse items that presented an

unfavorable impression," and that his test results should thus be viewed with caution. (Tr. 431). The ALJ stated that this finding reflects disfavorably on plaintiff and indicates that his allegations should be viewed with caution. (Tr. 18).

The ALJ next noted that, although plaintiff attributes his Hepatitis C, PTSD, and rash to his military service decades ago, these impairments did not prevent him from working in the past. (Tr. 17). The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of a disabling impairment. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

The ALJ pointed out that it was noted in recent treatment records that plaintiff lied to his treating psychiatrist, Dr. Sunny, about taking his prescribed medications. (Tr. 18, 231, 517). The ALJ properly noted that plaintiff's dishonesty with treating providers detracts from his credibility. The ALJ stated that these records also reveal that plaintiff has failed to comply with treatment, which is another factor weighing against plaintiff's credibility. (Tr. 18). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

The ALJ next noted that, although plaintiff alleges that his disability began on September 11, 2003, he received unemployment benefits in 2004. (Tr. 18, 30). The application for unemployment benefits requires an assertion of the ability to work and is facially inconsistent with a claim of disability. Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994). The ALJ properly found that plaintiff's receipt of unemployment benefits after his alleged onset of disability was inconsistent with his allegations of disability. (Tr. 18).

Finally, the ALJ discussed plaintiff's activities of daily living. (Tr. 18). The ALJ noted that plaintiff drives, cares for pets, attends PTSD classes, watches televison and movies, walks one mile a day, reads the newspaper, and cares for his disabled wife. (Tr. 18). In addition, although not mentioned by the ALJ, plaintiff testified at the hearing that he was considering volunteering at the VA two days a week. (Tr. 32). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ found that plaintiff's activities, although not conclusive on the issue of credibility standing alone, were somewhat inconsistent with allegations of disability. (Tr. 18).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and her finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining his residual functional capacity. Defendant contends that the ALJ's residual functional capacity determination is supported by substantial evidence.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> [t]here is nothing wrong with the claimant that would prevent him from sitting, standing or walking throughout a work day, and lifting and carrying up to 50 pounds occasionally and 25 pounds frequently. Due to his mental impairments, he cannot perform complex work or work requiring a high degree of interaction with others. When in a noisy

environment, he needs ear protection. The effect of the claimant's combined impairments was considered in arriving at this residual functional capacity.

(Tr. 20).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

Plaintiff contends that the residual functional capacity formulated by the ALJ is not supported by medical evidence. Specifically, plaintiff argues that plaintiff has significant limitations due to his Hepatitis C. As support for this argument, plaintiff points to two treatment notes, from October 2002 and June 2004, where plaintiff complained of nausea, vomiting, and fatigue.

Plaintiff's claim lacks merit. With regard to plaintiff's complaints of nausea, vomiting, and fatigue in October 2002, plaintiff's physician found that plaintiff's symptoms were probably not related to Hepatitis C but were more likely viral. (Tr. 454). In a Compensation and Pension examination of the liver, gall bladder, and pancreas conducted by Dr. Hoff on June 11, 2004, it was noted that plaintiff had several recent visits to the emergency room for complaints of

abdominal pain. (Tr. 363). Dr. Hoff noted that ultrasounds performed in 2003 revealed no abnormalities, and that the emergency room physician diagnosed plaintiff with abdominal pain, exact etiology unknown. (Tr. 363). Dr. Hoff indicated that, although plaintiff had no evidence of hepatomegaly, plaintiff complained of marked gastrointestinal symptoms of diarrhea, nausea, vomiting, and abdominal pain, which plaintiff attributed to his Hepatitis C. (Tr. 366). In an addendum, Dr. Hoff noted that, although plaintiff's lab results reflect that liver damage has been rather benign, plaintiff's reported symptoms were at least as likely as not related to his Hepatitis C. (Id.). No further complaints of gastrointestinal symptoms attributed to plaintiff's Hepatitis C were noted in the record. In sum, the medical record supports the ALJ's finding that plaintiff's Hepatitis C was mild and benign.

The ALJ's physical residual functional capacity determination is supported by substantial evidence. As support for his physical residual functional capacity determination, the ALJ first stated that physician assistant Jeffrey L. Beste expressed the opinion on July 31, 2003 that, although plaintiff may not be a candidate for any heavy physical work due to his Hepatitis C, he was certainly capable of performing sedentary or light work. (Tr. 19, 404). The ALJ noted that Mr. Beste did not find that plaintiff's maximum capacity was light work. (Tr. 19). The ALJ pointed out that, although Mr. Beste was not an acceptable medical source for establishing an impairment, his report may be considered in determining the severity of plaintiff's impairment and how it affects plaintiff's ability to work. See 20 C.F.R. § 404.1513(d). The ALJ stated that Mr. Beste's opinion was consistent with the opinion of the state agency medical consultant, Dr. Edwards, who expressed the opinion that plaintiff was capable of performing medium work. (Tr. 145). The ALJ found that this assessment was consistent with the record as a whole. The medical record is not supportive of any greater limitations than those found by the ALJ. Further,

as discussed previously, the record reveals that plaintiff walks one mile a day and has denied medication treatment for his Hepatitis C. Thus, substantial evidence supports the ALJ's determination.

Plaintiff also argues that the ALJ's residual functional capacity does not accurately reflect plaintiff's mental limitations. Specifically, plaintiff contends that although the ALJ noted plaintiff's relatively high GAF scores, a claimant's GAF scores is only one factor to consider. Plaintiff argues that the ALJ failed to consider diagnostic testing that revealed plaintiff suffered from significant PTSD. Plaintiff further argues that the consultative non-examining physician, Dr. Spence, found that plaintiff had several moderate limitations.

The undersigned finds that the mental residual functional capacity formulated by the ALJ is supported by substantial evidence in the record as a whole. First, the ALJ did not rely solely on plaintiff's relatively high GAF scores as plaintiff contends. Plaintiff points to diagnostic testing that showed plaintiff scored well above the threshold for an individual suffering with PTSD. (Tr. 255-258). The ALJ, however, accurately pointed out that this diagnostic testing also revealed that plaintiff exaggerated his symptoms and that his test results should thus be viewed with caution. (Tr. 431). With regard to Dr. Spence's opinion, Dr. Spence found that plaintiff had some moderate limitations in his ability to concentrate and persist and in his ability to interact socially. (Tr. 167-168). Dr. Spence also found that plaintiff was still capable of performing simple, repetitive work on a sustained basis and that he would function most efficiently in a low-demand work environment that requires only minimal contact with others. (Tr. 169). The ALJ's finding that plaintiff cannot perform complex work or work requiring a high degree of interaction with others is consistent with Dr. Spence's opinion. In determining the effect of plaintiff's mental impairment on his ability to work, the ALJ also properly considered the fact that plaintiff lied to

his treating psychiatrist and failed to take his psychiatric medications. Thus, the mental residual functional capacity formulated by the ALJ is supported by substantial evidence.

## 3.    <u>Vocational Expert Testimony</u>

Plaintiff finally argues that the ALJ erred in failing to obtain vocational expert testimony because plaintiff's limitation to simple, repetitive work is a non-exertional impairment. Plaintiff contends that once a non-exertional impairment is shown to exist, vocational expert testimony is required. Defendant argues that vocational expert testimony was not required because the ALJ properly found that plaintiff was capable of returning to his past relevant work.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the Medical-Vocational Guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." <u>Gray v. Apfel</u>, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics match those contained in Grids and only if the claimant does not have non-exertional impairments. <u>See</u> <u>Foreman v. Callahan</u>, 122 F.3d 24, 25 (8th Cir. 1997).

In this case, the ALJ found that plaintiff was capable of performing his past relevant work as a janitor as it was performed by him and as it was generally performed in the national economy. (Tr. 20-21). Plaintiff, however, argues that the ALJ erred in determining the plaintiff was capable of performing his past relevant work. Specifically, plaintiff contends that the ALJ did not make

explicit findings regarding the mental demands of plaintiff's past work and how plaintiff's mental limitations affected his residual functional capacity.

Plaintiff's argument lacks merit. The ALJ determined that plaintiff was not capable of performing complex work or work requiring a high degree of interaction with others. (Tr. 20). The undersigned has found that this determination is supported by substantial evidence. The ALJ then specifically found that plaintiff's past job did not involve complex work or a high degree of interaction with others either as plaintiff performed it or as it was generally performed in the national economy. (Id.). In doing so, the ALJ discussed the Dictionary of Occupational Titles (DOT) Specific Vocational Preparation (SVP) levels of the position. (Id.). The ALJ noted that, as generally performed in the economy, the position of janitor had an SVP of 2, which is indicative of unskilled work. (Id.). The ALJ further noted that the narrative description provided in the DOT indicates that the worker deals mostly with things and cleaning procedures rather than people. (Id.). The ALJ concluded that plaintiff failed to sustain his burden of proving that he was not capable of performing his past work. The ALJ was, therefore, not required to obtain vocational expert testimony.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this __30th__ day of March, 2009.

__Lewis M. Blanton__
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE